Aᴍᴇʀɪᴄᴀɴ Bʀɪᴅɢᴇ Dɪᴠɪsɪᴏɴ, Uɴɪᴛᴇᴅ Sᴛᴀᴛᴇs Sᴛᴇᴇʟ Cᴏʀᴘᴏ-
ʀᴀᴛɪᴏɴ, Appellant,

*v.*

Jᴏʜɴ C. McCʟᴜɴɢ, Appellee.

(*Nashville,* December Term, 1959.)

Opinion filed March 11, 1960.

318

CARROLL C. JOHNSON, JR., and WARING, WALKER, COX & LEWIS, Memphis, for appellant.

WILLIAM A. MCTIGHE, Memphis, for appellee.

Mr. Justice Swepston delivered the opinion of the Court.

This is a Workmen's Compensation case in which the appellant, hereinafter called the Company, elected to be liable for all occupational diseases, as permitted under T.C.A. sec. 50-1103. The appellee, hereinafter called petitioner, contended and the trial court found that he is entitled to recover for total and permanent disability by reason of pulmonary emphysema, complicated by pulmonary fibrosis, with probable bronchiectasis and probable carcinoma of the lung.

The Company has appealed and assigned 8 errors. The first is that there is no evidence to support the decree. The second is that the decree is contrary to the law and evidence; this is too general to be considered. The third and fourth are that there was no showing that it was an occupational disease as defined in T.C.A. sec.

50-1101, because there was no showing that the petitioner had breathed irritants or substances to which he was specially allergic in his employment and that the proof was too speculative. The fifth is that the court erred in allowing a recovery on the basis that the employment caused an aggravation or contributed to the progress of the disease, because the statute requires that the disease must have had its origin in a risk connected with the employment. The sixth is the statute of limitations, T.C.A. sec. 50-1108 requiring suit to be filed within one year after the beginning of the incapacity for work resulting from the occupational disease. The seventh is that the court erred in awarding compensation under the 1957 amendment, Ch. 270, because the petitioner's diseases were diagnosed before July 1, 1957, the effective date of the amendment. The eighth is the refusal of the court to allow the Company credit for certain group insurance payments and hospital benefits, to be more fully hereinafter explained.

As has been so frequently stated, the only function of this Court is to determine whether or not there is any evidence to support the findings of the Chancellor as to questions of fact and, of course, to determine whether he has committed any errors of law. Accordingly it is only necessary to recite the evidence which tends to support decree and not to treat of any conflicts in the evidence.

At the time of the trial in July, 1959, the petitioner was 64 years of age. Before he went to work for the Company in 1923 he had been in good health and his various kinds of occupations had kept him pretty well outdoors. His job here was that of a layerout which required him to mark steel beams or plates so that they could thereafter be punched by the pressers in the fabricating de-

partment of the plant. The building in which the petitioner worked was approximately 150 feet wide, about 230 feet long and about 60 feet high; there were large openings in one side which in the cold weather were covered by a canvas. When the steel beams were brought in to be marked it would be necessary to clean them off by sweeping because they contained both coarse and fine rust and ordinary dust; this material would be dispersed into the air in the building; there was so much dust that it was necessary for a sweeper to continually sweep the floor; sometimes the dust was sprinkled with water and again not; large machinery was cleaned off with air hoses. The dust was worse when the wind was blowing. During the cold weather, there were a good many heaters burning coke for the purpose of warmth and for a number of years carbide gas was used in the operation of the cutting torches and in later years, natural gas and oxygen. There were no tests of the percentage of concentration of this dust and gases made back some years ago but there appears to have been made some tests when this claim arose in an effort to show that the concentration was not enough to be an irritant, but that does not seem to be too important because what is one man's meat is another man's poison.

Three or four years after petitioner began work there, he began to experience a shortness of breath. His doctors treated him for respiratory trouble and about 1948 he became greatly concerned about his condition and consulted from time to time a series of about 10 or 12 doctors who gave various diagnosis of his trouble. On May 13, 1956, petitioner became unconscious at his home and was taken to the hospital and treated by his physicians, Dr. Burt Friedman and Dr. Otis Warr, who shortly there-

after diagnosed his trouble as pulmonary emphysema and pulmonary fibrosis. Petitioner testified, however, that nobody, neither the hospital nor his doctors, told him what was wrong with him and that he never did see anything about what was wrong with him until he got "his papers for disability."

At this point in view of the plea of the statute of limitations it is necessary to state the following. The Company elected to carry its own Workmen's Compensation insurance. In addition, there was carried, under the terms of the union contract, group insurance with a regular insurance company insuring employees against non-occupational hazards, the premium for which was paid one-half by the Company and one-half by the employee. As a result of petitioner's illness, May 11, 1956, one of his two doctor's, Dr. Otis Warr, on a form of the group insurance carrier for non-occupational accident and disease, filled out a claim and the same was signed by petitioner and turned over to the plant accountant, Russell J. Simmons, of the Company. In answer to question 3 "Do you claim this disability as related to your work? (Answer 'Yes or no')" appears the word "partly." A second question "If yes, explain" to which was stated "work requires exposure to dust and fumes from welding". This same information was furnished over the physician's signature. Question No. 5 on the back of said form containing information furnished by the Company in the name of Mr. R. L. Simmons shows a weekly non-occupational disability benefit of $40. Question 5, however, "Is the disability compensable under Workmen's Compensation or occupational laws (in the opinion of the Company)?" was not answered.

The word "partly" in the above form would ordinarily indicate that petitioner was aware of the partial connection between his disability and his occupation. Especially in view of the case of *Adams v. American Zinc Co.*, 205 Tenn. 189, 326 S.W.2d 425, and since the petition for compensation was not filed until October 14, 1958, ordinarily the statute of limitations would have to be held to have barred the claim.

There is more, however, than meets the eye at this point. Petitioner was in the hospital until August, 1956, and then he went back to work until he became ill in February, 1957. The same procedure was followed and in answer to said question 3 as to the relation of the disability to his work the doctor's answer was "No" in the part for the signature and which was signed by petitioner, but in answer to question 3 of the form to be signed by the physician the answer to that question as to whether the sickness or injury arose out of the patient's employment the answer was "Yes a little No mostly" following which was the explanation "aggravated by dust at work." On the back of said form Mr. Simmons showed again non-occuaptional disability $48 a week but again failed to answer question 5 as to whether the disability came under the Workmen's Compensation in the opinion of the Company. This form also under the doctor's statement showed not only the pulmonary emphysema and fibrosis but chronic copulmonate, chronic bronchitis.

Petitioner returned to work until he became ill again on October 29, 1957, and collected his maximum coverage of 6 months up through the period of November to May and has been disabled since that time. The form this

time was filled out by his doctor, Dr. Burt Friedman, and the diagnosis was acute virus influenza. The answer to question 3 was again "No" and on this occasion question 5 was answered by Mr. Simmons, "No, that it was not compensable under the Workmen's Compensation", and again $48 a week non-occupational disability was shown.

Mr. Simmons testified that on this third claim they started paying on the basis that his disease was acute virus flu but that after two or three payments had been made they switched over to the opinion that it was a lung condition. Then he testified as follows:

"Q. Now, was this particular situation referred to your Pittsburgh office of your Company for determination as to whether it would be compensation or insurance? A. It was, sir.

"Q. In other words, at that point there was a question in your mind at your plant whether this was a Workmen's Compensation claim or group insurance claim, wasn't there? A. That is correct.

"Q. Then you knew there was a contention being made that it was a Workmen's Compensation claim, don't you? A. Yes, I did."

Then with reference to the first claim which was referred to the Pittsburgh office, he testified as follows:

"The Court: And that was for what, information or advice?

"The witness: To advise as to whether it was to be paid as occupational or non-occupational.

"The Court: And what was the advice?

"The witness: The advice was to pay as non-occupational.

"The Court: Was that referral made to what department of the United States Steel?

"The witness: Casualty department, the American Bridge Division."

This petitioner had an eighth grade education plus such specialized self-education as had been obtained from the nature of his work. Just by what stretch of the imagination he could be held, from the above recited evidence, to have had either actual or imputed knowledge that his trouble was either partly or wholly an occupational disease, when neither of his physicians nor his employer were able to make the determination with certitude is beyond the comprehension of the writer. The petitioner testified that he decided to file for Workmen's Compensation when his illness of October 1957 arose. There is material evidence to sustain the Chancellor's finding.

We accordingly overrule the assignment with reference to the statute of limitations.

█ In regard to assignment 5, there seems to have been some confusion in the mind of counsel for petitioner and the Chancellor as to whether the question was relevant as to whether the employment caused an aggravation or contributed to the *progression* of the petitioner's disease. That assignment must be sustained because under subsec. 6 of T.C.A. sec. 50-1101 it must appear to have had its origin in a risk connected with the employment. It is so indicated in *Whitehead v. Holston Defense Corp.*, 205 Tenn. 326, 326 S.W.2d 482, 485.

■ The Chancellor, however, did not confine his finding to that particular phase nor is the medical proof confined thereto. It is true that when the doctor was asked his opinion in regard to these four diseases from which the petitioner was suffering, whether or not the inhalation of this dust and coke gas, etc., had contributed to the *progression and severity,* replied, "I would say that in all likelihood that that statement is correct. I believe that one would be safer in saying that the inhalation of these agents, these noxious agents would—could be better related to the progression of his symptoms and pathology rather than in relation to their actual cause initially. I think that would be a safer statement to make."

However, at another point when asked about a direct causal relationship the doctor testified in part as follows:

"I have made that statement previously and have communicated it to you, and I still think that it is not unlikely —that is, I wouldn't go out on a limb and say this inhalation did cause this man's diseases, the various diseases, but I say that the inhalation could have done and it is not unlikely that they actually did." * * * (After explaining that the petitioner could have had any of these four diseases without ever having worked in the place and been exposed to those irritating agents continued) * * *, but I would say that his inhalation of these dusts can not be excluded as an irritation that *could have contributed* toward the *cause* of one or several of these diseases, and certainly would be—could be considered as a factor in the exacerbation of his symptoms in the progression of one or several of these diseases * * *".

It is apparent accordingly that there is evidence to support the decree, both from a medical standpoint as well as from the history of this man's troubles. Assignments 1, 3 and 4 are accordingly overruled.

■ From what has already been said, it seems clear that assignment 7 relating to whether compensation should be awarded under the amendment of 1957 must be overruled.

■ With reference to assignment 8, it appears that substantial payments of non-occupational benefits were made by the insurance Company and hospital benefits under the Blue Cross. The Company now insists that it is entitled to credit or setoff of these payments. We do not think so. The only thing paid out by the Company in this regard was one-half of the premium, the other half of which was paid by the petitioner. If on any basis these payments are to be recovered by anybody, they would necessarily be recovered by the person or firm making the payments. Neither of these non-occupational insurors, however, is a party in this action and we do not see how the question is relevant in any way.

This assignment as well as all others are overruled and the decree below is affirmed with costs.